[L.A. No. 29795. In Bank. Mar. 19, 1971.]

CENTURY BANK, Plaintiff and Respondent, v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY,
Defendant and Appellant.

**COUNSEL**

Dillavou & Cox and C. C. Dillavou for Defendant and Appellant.

Goodstein & Moffitt, John P. Moffitt, Stuart S. Barnett and Maurice Mac Goodstein for Plaintiff and Respondent.

**OPINION**

**BURKE, J.**—Plaintiff bank recovered judgment upon an indemnity bond issued to it by defendant insurance company, which appeals. As hereinafter appears, we have concluded that the trial court correctly ruled that a document upon which plaintiff relied in making a loan fell within the bond's coverage with respect to counterfeited or forged instruments, and that the judgment should be affirmed.

Security for a loan of $200,000 made by plaintiff was a document entitled "Treaty of Reinsurance," assertedly issued by Manhattan Casualty Company and purportedly guaranteeing the loan in the event of the borrower's default. When the borrower defaulted, Manhattan denied liability under the treaty on the ground that it had been signed on behalf of Manhattan by one who had no authority to do so.

Plaintiff had purchased from defendant a banker's blanket bond which in pertinent part insured the bank against loss from a loan made "on the faith of . . . documents or other written instruments which prove to have been counterfeited [or] forged." Plaintiff sued defendant on the bond, and following a nonjury trial was awarded judgment for the full amount of the bond ($100,000), less $500 deductible.

The trial court found that one Rosenfield, upon the authorization of

one Begole, had affixed Begole's signature to the treaty of reinsurance, purportedly on behalf of Manhattan Casualty Company; that Begole was not, and knew he was not, authorized to sign such treaties on behalf of Manhattan; that the treaty was not executed by any authorized officer of Manhattan; that the treaty was knowingly "passed off as genuine" by Begole and Rosenfield for the express purpose of defrauding plaintiff.[1] The court concluded that inasmuch as the treaty had been falsely passed off to plaintiff "as a genuine and binding and valid obligation of Manhattan" the treaty constituted a forged and counterfeited document within the language and intent of the blanket bond. We agree.

In *Pasadena Inv. Co.* v. *Peerless Cas. Co.* (1955) 132 Cal.App.2d 328 [282 P.2d 124, 52 A.L.R.2d 203], cited by defendant, in which recovery was denied upon a bond containing a provision identical to that in the instant case, the documents in question recited facts which were false but the signature was that of the person who had actually done the signing on his own behalf and not purportedly on behalf of another. Similarly, in *Torrance National Bank* v. *Aetna Casualty & Surety Co.* (9th Cir. 1958) 251 F.2d 666, in which recovery was also denied, the involved credit union checks had been signed by an authorized employee, even though the employee was using the checks for an improper and unauthorized purpose.

Defendant also relies upon *People* v. *Bendit* (1896) 111 Cal. 274 [43 P. 901]. There the defendant without authority collected an account from a debtor who believed him to be the agent of the creditor company, and then in the debtor's presence signed the creditor's name to a receipt, followed by defendant's own initials. It was held that a conviction of forgery was not supported, although defendant "may have committed some other crime."

 However, the meaning of an insurance policy is to be ascertained according to the insured's reasonable expectation of coverage, and all doubts as to the meaning are to be resolved against the insurer. (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 267-275 [54 Cal.Rptr. 104, 419 P.2d 168]; *Jones* v. *Fireman's Fund Ins. Co.* (1969) 270 Cal.App.2d 779, 784-785 [76 Cal.Rptr. 97].) As noted in *Jones*, and cases there cited, the very title of the policy at issue, "Blanket Bond," indicates that the coverage is to be wide. By its provisions, the policy insures against loss from reliance upon forged or counterfeited documents, but it does not define those terms. Thus that language is to be construed in accord with the reasonable understanding of a layman as to what constitutes forgery or counterfeiting, rather than in accord with technical definitions and

---

[1]Defendant's suggestion that the evidence does not support the finding of Begole's lack of authority is utterly without merit, and seems not to be seriously pursued.

refinements of criminal statutes. It may be noted, however, that the precise conduct which caused plaintiff's loss in the present case falls within the literal definition of forgery set forth in Penal Code section 470.[2] Moreover, Webster's Third New International Dictionary defines the word "forge" in our context as "3: to make or imitate falsely," and defines "forgery" as "3: an act of forging; *usu:* the crime of falsely and with fraudulent intent making or altering a writing or other instrument that if genuine might apparently be of legal effect on the rights of another. . . ."

■ It appears obvious that the reasonable understanding and expectations of the insured as to the coverage of the blanket bond would encompass the falsely made and spurious treaty of reinsurance which it believed to be genuine and upon which it relied as security for its loan.

The judgment in plaintiff's favor is affirmed.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., and Mosk, J., concurred.

**SULLIVAN, J.**—Although I join with the majority in affirming the judgment, I must respectfully disagree with the reasoning by which they purport to arrive at this result. My differences center upon two points. First, I feel that the majority ignore the record which clearly shows that the case was tried on the theory that the bankers blanket bond covered losses resulting only from forgery as defined by the Penal Code. Secondly, the majority discard *sub silentio* the long-standing rule of the overwhelming majority of American jurisdictions to the same effect; namely, that the term "forgery" within the contemplation of an insurance policy or bond, such as the instant one, means an act amounting to the crime of forgery. The majority offer no reason why we should not make plaintiff adhere to his theory of the case below. Nor do they give any explanation for adopting a dictionary definition in place of the accepted majority rule.

As to the first point, I suggest that we are not called upon to reach the question whether the term "forgery" used in reference to the bankers

---

[2]Since 1905 section 470 has provided that "Every person who, with intent to defraud, signs the name of another person, or of a fictitious person, knowing that he has no authority so to do, to, or falsely makes, alters, forges, or counterfeits, any . . . contract . . . ; or utters, publishes, passes, or attempts to pass, as true and genuine, any of the above-named false, altered, forged, or counterfeited matters, . . . knowing the same to be false [etc.], with intent to . . . defraud any person . . . is guilty of forgery."

See also *People* v. *McKenna* (1938) 11 Cal.2d 327, 332 [79 P.2d 1065]: "The crime of forgery consists either in the false making or alteration of a document without authority or the uttering (making use) of such a document with the intent to defraud. (§ 470, Pen. Code.)"; *People* v. *Parker* (1970) 11 Cal.App.3d 500, 511-512 [89 Cal. Rptr. 815].

blanket bond can include acts other than those proscribed by Penal Code section 470. Throughout the trial of this case counsel for plaintiff consistently maintained that "forgery" referred to the crime prohibited by section 470.[1] Only on appeal has plaintiff, perhaps realizing the weakness of his position, raised the theory adopted by the majority.

---

[1] "MR. GOODSTEIN [plaintiff's counsel]: Now to get into the argument itself, *the definition of forgery is set out in Section 470* of the Penal Code. Simplified, it is (1) signing somebody's name without authority, or, (2) the passing off as true or genuine of any document, knowing the same to be false, altered, forged or counterfeited, with the intent to prejudice, damage or defraud any person.

"Here we have *a case that comes within the terms and the definition* on two counts.

"THE COURT: Was it a forged document? This is the question. And you stated what the definition is, and I guess *this is pretty much agreed. This is the Penal Code definition* and it pretty much covers the situation as to what is a forgery.

"MR. GOODSTEIN: And that includes passing off, if your Honor please. *People* v. *Brown*, cited in our briefs—

"THE COURT: Let's just say now that this was not really a valid obligation of Manhattan Casualty and these people all knew it and passed it off on the bank. Is that forgery?

"MR. GOODSTEIN: Yes, it is forgery.

"MR. GOODSTEIN: All right.

"To sum up, it is our intent there was forgery on two counts; Section 470 of the Penal Code. One is we do not believe there was any authority in Mr. Rosenfield to have signed Mr. Begole's name, and he passed off that instrument with the word 'attest' under the signature by Mr. Sarowitz, leading one relying on the instrument to believe this was Mr. Begole's signature, for whatever it was worth. But aside from that, from all that, he passed off this instrument which he knew was not a valid, binding instrument of Manhattan Casualty to Century Bank, and extracted on the basis of this instrument, or at least one of the causes, and that's all.

"THE COURT: What does the section say? . . .

"THE COURT: In other words, of course we are talking about a criminal section, but it is any person who signs a name without authority or falsely makes a contract.

"Are there any other elements?

"MR. GOODSTEIN: Yes, 'or utters or publishes . . .'

"THE COURT: We have tried it on the theory, no question that the Court has listened to all this evidence and it has been stated time and again the question was, was there a forgery under the bond? I couldn't at this point say there is no cause of action alleged.

"MR. GOODSTEIN: Or if there is any doubt in your Honor's mind, we ask to reopen and we will move to amend the Complaint to conform to the proof.

"THE COURT: The case has been tried on the theory that this was the issue. There has been no misleading as far as the defendant is concerned. So you haven't spelled out anything in the Complaint then as far as what the forgery consisted of, and I am just trying to find out now what—*we have been referring to this Section 470.* Then 'the next third part is passing true and genuine, in any of the above-named, false documents, knowing them to be false with intent to prejudice or defraud any person.'

"It seems to me that if you have a case it would either come under the first or the third elements, either signing the name of that authority or passing a false document, knowing it is false, with intent to defraud. I think that is what is involved here, both of those questions.

"MR. GOODSTEIN: That is correct, your Honor.

"THE COURT: He has got to file a brief. I don't feel he has adequately covered this

"It is the general rule that a party to an action may not, for the first time on appeal, change the theory of the cause of action. [Citations.] There are exceptions but the general rule is especially true when the theory newly presented involves controverted questions of fact or mixed questions of law and fact. If a question of law only is presented on the facts appearing in the record the change in theory may be permitted. [Citation.] But if the new theory contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial the opposing party should not be required to defend against it on appeal. [Citations.]" (*Panopulos* v. *Maderis* (1956) 47 Cal.2d 337, 340-341 [303 P.2d 738]; *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].)

In this case, the interpretation of the word "forgery" involves a mixed question of law and fact. By failing to raise at trial the interpretation it now urges, plaintiff denied defendant the opportunity to present extrinsic evidence bearing on the proper interpretation of the blanket bond. (See *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641].) We should not decide this case on an issue as to which defendant was never given the opportunity to present evidence. Since plaintiff during trial never contended that the bankers blanket bond covered acts not prohibited by Penal Code section 470, it should not be allowed to raise that issue on appeal. With all due respect to my colleagues, I suggest that this court should not turn its back upon such a well established rule of appellate practice.

But assuming arguendo that plaintiff has properly raised the issue, I cannot support the majority's facile conclusion that as used in the blanket bond "forgery" includes virtually any fraudulent act perpetrated by means of a false document. As mentioned above, the great weight of authority in this country holds that in insurance policies or bonds covering forgery, that term refers only to those acts punishable as the crime of forgery. (*Pasadena Inv. Co.* v. *Peerless Cas. Co.* (1955) 132 Cal.App.2d 328

in his argument. I want to see some of his cases. You are taking a position, or am I correct, Mr. Goodstein, assuming these facts are found this is a forgery?

"MR. GOODSTEIN: Yes, absolutely, emphatically.

"THE COURT: All right. I want some law on it. I can't cite Goodstein on forgery; I have got to have something to back it up.

"MR. GOODSTEIN: I understand. I think there is plenty in what we have given your Honor, but we will give you more. . . .

"THE COURT: I say what we are concerned with here is *what is meant in Section 470* in effect by passing or uttering as true and genuine a false contract. In other words, what is a false contract and what is meant by the section, isn't it?

"MR. GOODSTEIN: Right.

"THE COURT: Isn't that the question?

"MR. GOODSTEIN: *That is the question* and our contentions and we will point it out." (Italics added.)

[282 P.2d 124, 52 A.L.R.2d 203]; *Torrance National Bank* v. *Aetna Casualty & Surety Co.* (9th Cir. 1958) 251 F.2d 666; *Fitzgibbons Boiler Co.* v. *Employers' L. Assur. Co.* (2d Cir. 1939) 105 F.2d 893, 896; 52 A.L.R.2d 207, 208-210 (1957).) The majority blithely ignore this line of authority without furnishing any reason why it should be repudiated.

It is of course well settled that "any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer [citations]" and that "[i]f semantically permissible, the contract will be given such construction as will fairly achieve its object of securing indemnity to the insured for the losses to which the insurance relates." (*Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437 [296 P.2d 801].) Although courts in applying this general principle have followed "the basic precept that they would look to the words of the contract to find the meaning which the parties expected from them, they have also applied the doctrine of the adhesion contract to insurance policies, holding that in view of the disparate bargaining status of the parties we must ascertain that meaning of the contract which the insured would reasonably expect." (Fns. omitted.) (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269-270 [54 Cal.Rptr. 104, 419 P.2d 168]; see also *Steven* v. *Fidelity & Casualty Co.* (1962) 58 Cal.2d 862 [27 Cal.Rptr. 172, 377 P.2d 284].) But in this case we are not dealing with an adhesion contract; in the transactions between plaintiff bank and defendant insurer there was no such gross inequality of bargaining position as we found in *Steven* and *Gray*. Indeed, it appears that the terms of the blanket bond were drafted in cooperation with a committee of the American Bankers Association.

There is no evidence in this case that plaintiff expected, whether reasonably or unreasonably, that the coverage of this policy would be more extensive than Penal Code section 470. Indeed, plaintiff's failure to raise the issue before the trial court graphically demonstrates that no such expectation existed. Nor is the use of the word "forgery" ambiguous in this context; rather, as the authorities cited above illustrate, "forgery" as used in such insurance policies or bonds has consistently been held for over 40 years to mean acts constituting the crime of forgery. The only ambiguity in the use of that word is the ambiguity introduced by the opinion of the majority which sweeps aside the accepted definition of the word.[2]

---

[2]It is interesting to note that the majority seem for purposes of insurance policies and bonds to accept as a proper definition of "forgery" the definition of that term found in Webster's Third New International Dictionary. The meaning there given is essentially the same as the common law definition of the crime of forgery and the wording of Penal Code section 470 prior to its amendment in 1905. Compare the following statement of the common law rule (which we found identical to the crime then proscribed by section 470 (*People* v. *Bendit* (1896) 111 Cal. 274, 280 [43 P. 901])) with the definition quoted by the majority (p. 322, *ante*): "Forgery, at common law,

I can find no justification for the majority's refusal to follow the established rule of law in this case.

Consequently I am of the view that the proper question confronting us is whether the acts here involved constitute forgery within the compass of Penal Code section 470.[3] The trial court found that Rosenfield with Begole's authorization, affixed Begole's signature to the treaty of reinsurance. It did not find that Begole's signature was forged but only that Begole was not and knew he was not authorized to sign treaties of reinsurance on behalf of Manhattan Casualty Company.

Prior to the 1905 amendment to section 470 the facts as set forth above did not constitute the crime of forgery. "When the crime [of forgery] is charged to be the false making of a writing, there must be the making of a writing which falsely *purports to be the writing of another.* [Original italics.] The falsity must be in the writing itself—in the manuscript. A false statement of fact in the body of the instrument, *or a false assertion of authority to write another's name,* or to sign his name as agent, by which a person is deceived and defrauded, is not forgery. There must be a design to pass as the genuine writing of another person that which is not the writing of such other person." (Italics added.) (*People* v. *Bendit, supra,* 111 Cal. 274, 276-277.) The 1905 amendment to section 470, however, made significant changes in the language of that section so that in my view the activities of Begole in this case now fall within its proscription. As amended, the section provides that: "Every person who, with intent to defraud, signs the name of another person, or of a fictitious person, knowing that he has no authority so to do" commits forgery.[4] The code commissioner's note to this amendment indicates that "[t]he purpose of the amendment is to make the forging of the name of a fictitious person, or knowingly signing the name of another, criminal if done with intent to defraud."

In the case at bench, the trial court found that Begole knew that he was not authorized to sign the treaty of reinsurance on behalf of Manhattan

---

is the false making or materially altering, with intent to defraud, of any writing which, if genuine, might apparently be of legal efficacy, or the foundation of a legal liability." (2 Bishop's Criminal Law (9th ed.) § 523.) Since we held in *People* v. *Bendit, supra,* 111 Cal. 274, that the acts here perpetrated by Begole would not constitute fraud under the definition of that crime just quoted, Begole's acts clearly would not constitute forgery under the Webster's definition which the majority appear so anxious to adopt in the instant case.

[3]On appeal for the first time plaintiff contended that the treaty of reinsurance was a "counterfeited" document and therefore was within the coverage of the bankers blanket bond. Since this issue was not raised at any time during trial, it may not properly be considered on appeal. (See text following fn. 1, *ante.*)

[4]The 1905 amendment to section 470 among other changes substituted the above-quoted langauge for "Every person who, with intent to defraud another. . . ."

Casualty Company. It also found that Begole acted with the express purpose of defrauding plaintiff. Therefore, if Begole signed the name of another person[5] within the meaning of section 470, he committed the crime of forgery as defined by that section.

The record before us establishes, in my opinion, that Begole, with the requisite intent, signed "the name of another person," to wit, the Manhattan Casualty Company, and that he thereby committed forgery.[6] Begole's name was affixed to the document immediately below the words "Manhattan Casualty Company," on a line left blank but preceded by the word "Signed:". On the line below Begole's signature appears the word "Attested:" followed by the signature of A. F. Sarowitz. I am of the opinion that these three lines constituted the signature of Manhattan Casualty Company, and that by completing that signature with his name, Begole committed forgery.

" 'The term signature includes any memorandum, mark or sign, written or placed upon any instrument or writing with the intent to execute or authenticate such instrument or writing.' " (*Matter of Romaniw* (1937) 163 Misc. 481, 488 [296 N.Y.S. 925, 933].) The signature indicates the intent of the signing party to be bound by the document. Here, it is clear that Begole was not a party to the agreement, but only signed his name as evidence of the fact that the signature of Manhattan Casualty Company had properly been affixed to the documents. (See *Greve* v. *Taft Realty Co.* (1929) 101 Cal.App. 343, 348-351 [281 P. 641].) By writing his name as he did, Begole, with intent to defraud, signed the name of Manhattan Casualty Company knowing that he had no authority so to do. He thereby committed the crime of forgery. (See *People* v. *Berman* (Gen. Sess. 1960) 197 N.Y.S.2d 346, 353-356; *Moore* v. *State* (1966) 241 Ark. 335, 337 [407 S.W.2d 744].)

Since Begole committed forgery within the meaning of section 470 of the Penal Code, the document he signed was a "forgery" within the meaning of the bankers blanket bond. Plaintiff's loss, thus, was covered by the bond and the judgment should be affirmed.

---

[5]Section 7 of the Penal Code states in part: "the word 'person' includes a corporation as well as a natural person. . . ." Thus, Begole could commit forgery by signing the name of Manhattan Casualty Company with intent to defraud and with knowledge that he had no authority so to do.

[6]As already mentioned, the trial court found that Begole's name was signed by Rosenfield pursuant to express authority given him by Begole. Since Rosenfield acted as a mere amanuensis for Begole, the fact that the former rather than Begole physically attached Begole's name to the document is irrelevant to the substantive legal issues, and for the sake of clarity I treat the case as if Begole had signed his own name.